# United States Court of Appeals
## For the First Circuit

No. 15-2377

UNITED STATES OF AMERICA,

Appellee,

v.

JOHVANNY AYBAR-ULLOA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. Garcia-Gregory, U.S. District Judge]

Before

Howard, Chief Judge,
Lynch, Thompson, Kayatta, and Barron,
Circuit Judges.*

Heather Clark, with whom Clark Law Office was on brief, for
appellant.
Scott A.C. Meisler, Attorney, U.S. Department of Justice,
Criminal Division, Appellate Section, with whom W. Stephen
Muldrow, United States Attorney, Mariana E. Bauzá-Almonte,
Assistant United States Attorney, Chief, Appellate Division, Brian
A. Benczkowski, Assistant Attorney General, and John P. Cronan,
Principal Deputy Assistant Attorney General, were on brief, for
appellee.

---

\* Judge Torruella heard oral argument in this matter and
participated in the semble, but he did not participate in the
issuance of the opinion in this case.

Opinion En Banc

January 25, 2021

**KAYATTA**, <u>Circuit Judge</u>. United States law enforcement authorities apprehended Johvanny Aybar-Ulloa ("Aybar") on a stateless vessel in international waters carrying packages of cocaine in violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501-70508. In appealing his subsequent conviction, Aybar makes a two-step argument. First, he contends that Congress's authority to criminalize and punish conduct on the high seas under Article I, Section 8, Clause 10 of the United States Constitution ("the Define and Punish Clause") must be cabined by the limitations of international law on a nation's power to criminally prosecute conduct on the high seas. Second, he argues that the United States exceeded those limitations of international law by prosecuting him in this case.

In a divided opinion, a panel of this court trained its attention exclusively on the second part of Aybar's argument. See <u>United States</u> v. <u>Aybar-Ulloa</u>, 913 F.3d 47, 53-56 (1st Cir. 2019). Relying on prior circuit precedent, the panel majority rejected that necessary part of Aybar's argument for two reasons: First, we previously held in <u>United States</u> v. <u>Victoria</u>, 876 F.2d 1009 (1st Cir. 1989) (Breyer, J.), that international law does indeed "give[] the United States . . . authority to treat stateless vessels as if they were its own." <u>Id.</u> at 1010 (second alteration in original) (quoting <u>United States</u> v. <u>Smith</u>, 680 F.2d 255, 258 (1st Cir. 1982)). Second, our prior opinion in <u>United States</u> v.

- 3 -

Cardales, 168 F.3d 548 (1st Cir. 1999), included certain statements construing international law as allowing a nation to define trafficking in controlled substances aboard vessels as a threat sufficient to justify an assertion of jurisdiction under the "protective principle." Id. at 553.

As both the panel majority and the panel dissent observed, our prior opinion in Victoria "did not fully spell out" its reasoning. Aybar-Ulloa, 913 F.3d at 54; see also id. at 61 (Torruella, J., dissenting in part). Cardales, in turn, can be read as applying only to the circumstance where a foreign flag nation consents to the application of United States law to persons found on that nation's flagged vessel. Id. at 55-56 (citing Cardales, 168 F.3d at 552-53). And the question of the United States' jurisdiction over persons on vessels on the high seas recurs in this circuit. For those reasons, we granted Aybar's petition to rehear this appeal en banc.

Following that rehearing, we now affirm Aybar's conviction. In doing so, we find that his prosecution in the United States for drug trafficking on a stateless vessel stopped and boarded by the United States in waters subject to the rights of navigation on the high seas violates no recognized principle of international law. To the contrary, international law accepts the criminal prosecution by the United States of persons like Aybar, who was seized by the United States while trafficking cocaine on

a stateless vessel on the high seas, just as if they were trafficking on a United States-flagged ship. We therefore need not and do not reach the question of whether the application of MDLEA to Aybar would be constitutional were international law otherwise. We also need not and do not rely on the protective principle, leaving its potential application for another day. Finally, for the reasons agreed upon by the full panel, we vacate Aybar's sentence and remand for resentencing under the Sentencing Commission's clarified guidance reflected in Amendment 794. See id. at 56-57.

## I.

## A.

As Aybar urges, we take the facts as "[p]er the affidavit [filed by the government] in support of the complaint." On August 9, 2013, the HMS Lancaster, a foreign warship, launched a helicopter while on patrol in the Central Caribbean. Operators aboard the helicopter spotted a thirty-foot go-fast vessel dead in the water at 15-03N, 067-01W, an area approximately 160 nautical miles south of Puerto Rico constituting international waters.[1] The

---

[1] The coordinates provided by the government nonetheless appear to place the defendant's vessel within the Exclusive Economic Zone ("EEZ") of the United States. Because the right of freedom of navigation on the high seas applies in the EEZ, we proceed with reference to the rules of interdiction applicable on the high seas. United Nations Convention on the Law of the Sea ("UNCLOS") arts. 58(1-2), 87, Dec. 10, 1982, S. Treaty Doc. No. 103-39, 1833 U.N.T.S. 397; see generally id. pt. VII, § 1. We

vessel bore no indicia of nationality and was carrying numerous packages in plain view.

A Law Enforcement Detachment Team of the United States Coast Guard was embarked on the HMS Lancaster at the time of the incident. Members of this team launched a small boat to conduct a right-of-visit approach. Coast Guard personnel identified defendant Aybar and two others aboard the go-fast vessel. Aybar and another member of the vessel claimed to be citizens of the Dominican Republic, while the master of the vessel claimed Venezuelan citizenship. In response to inquiry from the Coast Guard personnel, the master of the vessel made no claim of nationality for the vessel. The Coast Guard personnel suspected contraband.

Concluding that the vessel was without nationality, the Coast Guard personnel then boarded and searched the vessel. Following the search, the Coast Guard proceeded to take all three men and the packages found on board back to the HMS Lancaster, where the packages' contents tested positive for cocaine. The three men were then transferred to a United States Coast Guard vessel and taken to Ponce, Puerto Rico, where they were held in custody.

---

do not address any potential limitations on freedom of navigation in the EEZ that may be imposed in this area. See id. art. 58(3).

**B.**

Shortly thereafter, a federal grand jury issued an indictment against Aybar, charging him under MDLEA with conspiring to possess with intent to distribute cocaine on board a vessel subject to the jurisdiction of the United States, 46 U.S.C. § 70506(b) (count one), and aiding and abetting possession with intent to distribute cocaine on board a vessel subject to the jurisdiction of the United States, 46 U.S.C. §§ 70502(c)(1)(A), 70503(a)(1), 70504(b)(1), 70506(a), 18 U.S.C. § 2 (count two). The indictment also included an allegation of forfeiture, 46 U.S.C. § 70507.

MDLEA provides that "[w]hile on board a covered vessel, an individual may not knowingly or intentionally . . . manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance." 46 U.S.C. § 70503(a)(1). As relevant here, a "covered vessel" includes "a vessel subject to the jurisdiction of the United States," id. § 70503(e)(1), which is defined to include "a vessel without nationality," id. § 70502(c)(1)(A). "[A] vessel without nationality," in turn, includes "a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel." 46 U.S.C. § 70502(d)(1)(B).

Aybar moved to dismiss the indictment for lack of jurisdiction, arguing that Congress's power under Article I "[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations," U.S. Const. art. I, § 8, cl. 10, did not reach his conduct. After the district court denied his motion, Aybar proceeded to plead guilty. Aybar's plea accepted the facts substantiating the charges against him under MDLEA. Those facts, in turn, make clear that the vessel on which he was found was "a vessel without nationality" as defined in section 70502(d)(1)(B) because, while on board the vessel, the master made no claim of nationality when requested to do so by a United States officer authorized to enforce the United States drug laws. Despite his guilty plea and concessions, Aybar adequately preserved his challenge to Congress's constitutional power to criminalize his conduct pursuant to its Article I powers. See Class v. United States, 138 S. Ct. 798, 804-05 (2018). On January 9, 2019, a divided panel rejected that challenge, affirming his conviction. For unrelated reasons, the panel also vacated the district court's sentence and remanded for further proceedings.

## II.

Our analysis proceeds in five parts summarized as follows: First, the "go-fast" ship upon which Aybar travelled was rendered "stateless" when its master on board failed upon request

to make a valid claim of nationality for it, flouting, among other things, the important requirement of international law that every vessel on the high seas sail under the flag of a nation state. Second, as a stateless vessel, the ship was susceptible to the exercise of jurisdiction by any nation intercepting the vessel on the high seas, just as if the vessel were one of that nation's own. Third, the exercise of jurisdiction over Aybar's ship just as if it were a United States vessel included jurisdiction over drug trafficking on the vessel just as if it were drug trafficking on a United States vessel, which is considered to be the territory of the United States. Fourth, the application of that territorial jurisdiction to prosecute Aybar in a United States court for illegally trafficking cocaine is compatible with, and welcomed by, any relevant specific rules and undertakings governing the assertion of domestic power on the high seas. Fifth, we offer several important caveats.

**A.**

Under international law governing the seas, every vessel must sail under the flag of one, and only one, state. United Nations Convention on the Law of the Sea ("UNCLOS") art. 92, Dec. 10, 1982, S. Treaty Doc. No. 103-39, 1833 U.N.T.S. 397.[2] In

---

[2] The United States has signed but not ratified UNCLOS. We nevertheless cite to it as evidence of the customs and usages of international law. See The Paquete Habana, 175 U.S. 677, 700 (1900); cf. United States v. Alaska, 503 U.S. 569, 588 n.10 (1992)

turn, every state maintains an obligation to "fix the conditions for the grant of its nationality to ships, for the registration of ships in its territory, and for the right to fly its flag," id. art. 91(1), and to "issue to ships to which it has granted the right to fly its flag documents to that effect," id. art. 91(2). While the type of registration papers may differ from state to state depending on domestic laws, every state must keep a register of "the names of all private vessels sailing under its flag," and ensure "that every vessel may be identified from a distance." 1 L.F.L. Oppenheim, International Law §§ 290 (Jennings et al. eds., 9th ed. 2008). "Without a flag or papers, a vessel may also traditionally make an oral claim of nationality when a proper demand is made." United States v. Matos-Luchi, 627 F.3d 1, 5 (1st Cir. 2010).

This "flag-state" system -- by which all vessels are required to fly the flag of a state, and states are in turn required to approve the conditions for granting rights to fly their flag -- serves several purposes. First, by subjecting vessels to the exclusive jurisdiction of the flag state, the flag-state system guarantees freedom of navigation in international waters, as states generally may not interfere with the passage on the high

(noting that the United States has stated that the "baseline provisions [of UNCLOS] reflect customary international law" (citation omitted)).

seas of ships lawfully flying the flag of another state. See Richard A. Barnes, "Flag States," in The Oxford Handbook on the Law of the Sea 313 (Rothwell et al. eds. 2015); cf. UNCLOS arts. 87, 90. Second, the flag-state system provides clear guidance as to which state bears the primary obligation to regulate conduct occurring on vessels on the seas. See R.R. Churchill & A.V. Lowe, The Law of the Sea 205 (1988); cf. UNCLOS art. 94. Third, the flag-state system indicates which state may bear responsibility for the conduct of a ship on the seas. See Churchill & Lowe, supra, at 205. Thus, the flag-state system is "[o]ne of the most important means by which public order is maintained at sea." Id.

Aybar concedes that the ship upon which he was found plainly did not comply with this system. It flew no flag, its master claimed no nationality, and no other indicia of registration or nationality were present when authorized United States officials stopped and boarded the ship. Presumably for these reasons, Aybar does not dispute that his vessel may be treated as "stateless" under international law. See, e.g., Matos-Luchi, 627 F.3d at 6 (stating that a vessel "may be deemed 'stateless' . . . if it fails to display or carry insignia of nationality and seeks to avoid national identification").

International law plainly provides that a nation's warship (or law enforcement ship) may stop and board a stateless vessel on the high seas. See UNCLOS art. 110(1)(d); Restatement (Third) of the Foreign Relations Law of the United States § 522(2)(b) (1987) [hereinafter "Restatement (Third)"] ("[A] warship or clearly-marked law enforcement ship of any state may board [a nongovernmental ship] . . . if there is reason to suspect that the ship . . . is without nationality . . . ."); see also Brownlie's Principles of Public International Law 285, 292 (Crawford ed., 9th ed. 2019) [hereinafter "Brownlie's Principles"]; Malcolm Shaw, International Law 457 (8th ed. 2017) ("A ship that is stateless, and does not fly a flag, may be boarded and seized on the high seas."); Myres S. McDougal & William T. Burke, The Maintenance of Public Order at Sea and the Nationality of Ships, 54 Am. J. Int'l L. 25, 76-77 (1960) ("So great a premium is placed upon the certain identification of vessels for purposes of maintaining minimal order upon the high seas . . . that extraordinary deprivational measures are permitted with respect to stateless ships."). In short, "[b]ecause stateless vessels do not fall within the veil of another sovereign's territorial protection," the vessel is afforded no right of free navigation. United States v. Rendon, 354 F.3d 1320, 1325 (11th Cir. 2003) (quoting United States v. Caicedo, 47 F.3d 370, 373 (9th Cir.

1995)); see also United States v. Rubies, 612 F.2d 397, 402-03 (9th Cir. 1979) ("A foreign flag[ged] vessel is thereby protected by her country of registration. . . . An unregistered, or 'stateless,' vessel, however, does not have these rights or protections.").

To say that international law grants to any state the authority to interdict and exercise physical control over a stateless vessel is to say that international law renders stateless vessels "susceptible to the jurisdiction of any State," Barnes, supra, at 314, including the United States. See Smith, 680 F.2d at 258 (recognizing that "[i]nternational law . . . allows any state to extend its authority over a stateless ship") (citing United Nations Convention on the High Seas, 13 U.S.T. 2313, T.I.A.S. No. 5200 (1958)); see also United States v. Juda, 46 F.3d 961, 967 (9th Cir. 1995); United States v. Martinez-Hidalgo, 993 F.2d 1052, 1055 (3d Cir. 1993); Victoria, 876 F.2d at 1010 (recognizing that international law "gives the United States . . . authority to treat stateless vessels as if they were its own"); United States v. Alvarez-Mena, 765 F.2d 1259, 1265 (5th Cir. 1985) ("[I]nternational law does not preclude any nation from exercising jurisdiction over stateless vessels on the high seas."); United States v. Pinto-Mejia, 720 F.2d 248, 260-61 (2d Cir. 1983); United States v. Marino-Garcia, 679 F.2d 1373, 1383 (11th Cir. 1982) ("[I]nternational law permits any nation to subject stateless

- 13 -

vessels on the high seas to its jurisdiction."); <u>United States</u> v. <u>Howard-Arias</u>, 679 F.2d 363, 371 (4th Cir. 1982); Malcolm D. Evans, "The Law of the Sea," in <u>International Law</u> 651, 656-60 (Malcolm D. Evans ed., 3d ed. 2010) ("[I]f a ship is stateless, or flies more than one flag so that its true State of registry is not clear, then any state can exercise jurisdiction over it.") (cited with approval in Restatement (Fourth) of the Foreign Relations Law of the United States § 408 n.3 (2018) [hereinafter "Restatement (Fourth)"]).

In sum, there is no doubt that the United States could exercise jurisdiction over the stateless vessel upon which Aybar was found.

## C.

Offering no persuasive reason why the United States could not exercise jurisdiction over the stateless vessel upon which he was found, Aybar narrows his focus to his prosecution. While it may be clear that international law allows any state to exercise jurisdiction over a flagless vessel, even to the point of stopping, boarding and seizing it should they wish to do so, he asserts that the prosecution of those on board the vessel under the laws of the seizing country is a different matter altogether.

With respect to United States-flagged vessels, the law does not distinguish between jurisdiction over the vessel itself and jurisdiction over the people on the vessel and their conduct

- 14 -

on board.  It is well settled that the United States has jurisdiction over conduct occurring on United States-flagged vessels because: (1) "[t]he deck of a private American vessel . . . is considered . . . constructively as territory of the United States," Ross v. McIntyre, 140 U.S. 453, 464 (1891); and (2) a state's jurisdiction over conduct on its territory is one of "the most commonly recognized bases of jurisdiction," Restatement (Fourth) § 407 cmt. c; see also id. § 408 cmt. a ("A state may exercise prescriptive jurisdiction with respect to persons, property, and conduct within its territory."); Smith, 680 F.2d at 257 (similar).  Cf. Restatement (Third) § 502 cmt. d (explaining that a flag state has jurisdiction over "the conduct of a ship" as well as "any activity aboard the ship").

Two centuries of case law strongly suggest that the same territorial principles apply to conduct aboard a stateless vessel. Shortly after our nation's founding, the United States Supreme Court issued a series of opinions addressing the scope of the United States' jurisdiction over conduct committed on board non-United States vessels.  The Court rejected the assertion of jurisdiction in domestic courts over murders committed by and against foreigners on foreign vessels.  See United States v. Furlong, 18 U.S. (5 Wheat.) 184, 196-98 (1820); see also United States v. Klintock, 18 U.S. (5 Wheat.) 144, 151 (1820).  Murders committed by and against foreigners on stateless vessels, though,

- 15 -

could be prosecuted in the United States.  See Klintock, 18 U.S. at 151-52; United States v. Holmes, 18 U.S. (5 Wheat.) 412, 417-18; see also Furlong, 18 U.S. at 194-95 (stating that murder is "equally punishable" in the courts of the United States when committed on an American ship or on a stateless pirate ship, as opposed to on a foreign ship, which presented "a question of more difficulty").

While those cases dealt with vessels that were deemed stateless because of piratical conduct, the Court did not hold that piracy was the only means by which a vessel could be deemed stateless so as to justify United States prosecutorial jurisdiction.  On that point, Holmes conveyed the opposite, signaling that conduct of persons on board a stateless vessel could be prosecuted whether the vessel was piratical or not:

> The said Circuit Court had jurisdiction of the offen[s]e charged in the indictment, if the vessel, on board of which it was committed, had, at the time of the commission thereof, no real national character but was possessed and held by pirates, or by persons not lawfully sailing under the flag, or entitled to the protection of any government whatsoever.

18 U.S. at 419.

These founding-era cases also did not hold that a foreign national may be prosecuted in the United States for his conduct on the high seas only if he personally renounces his nationality by engaging in piracy.  True, the Court certainly approved the

- 16 -

prosecution of "those who acknowledge the authority of no State." Klintock, 18 U.S. at 152. But the Court also repeatedly emphasized the statelessness of the ship, rather than the nationality of the persons on board, in upholding the United States' exercise of jurisdiction over those persons. For example, in Klintock, the Court held that "persons on board of a vessel not at the time belonging to the subjects of any foreign power, but in possession of a crew acting in defiance of all law, and acknowledging obedience to no government whatever, . . . are proper objects for the penal code of all nations." Id. To the extent that there is any ambiguity as to whether the phrase "acknowledging obedience to no government whatever" was intended to modify the "persons" or the "vessel" at issue, the Court clarified in Holmes that the status of the vessel was determinative:

> In Klintock's case, it was laid down, that to exclude the jurisdiction of the Courts of the United States, in cases of murder or robbery committed on the high seas, the vessel in which the offender is, or to which he belongs, must be, at the time, . . . the property of a subject of a foreign State, and . . . subject, at that time, to [its] control. But if the offen[s]e be committed in a vessel, not at the time belonging to subjects of a foreign State, but in possession of persons acknowledging obedience to no government or flag, and acting in defiance of all law, it is [punishable in the courts of the United States]. It follows, therefore, that murder or robbery committed on the high seas, may be an offen[s]e cognizable by the Courts of the United States, although it was committed on board of a vessel not belonging to citizens of the United States, []

> if she had no national character, but was possessed and held by pirates, or persons not lawfully sailing under the flag of any foreign nation.

18 U.S. at 416-17. Because the Court in Holmes held that the existence of jurisdiction depended on whether or not the vessel at issue was under the control of a foreign nation, "it made no difference, as to the point of jurisdiction, whether the [offenders] were citizens of the United States" or citizens of foreign nations. Id. at 419-20. As we have described, this approach comports with the overall system of flag-state jurisdiction. See Furlong, 18 U.S. at 198 (explaining that the distinction between foreign vessels and stateless vessels serves to avoid "offensive interference with the governments of other nations").

Our concurring colleague well develops the case for treating Holmes as binding authority dictating our holding in this case. This is certainly a defensible view. If murder, a crime over which there is no universal jurisdiction, can be prosecuted by the United States when committed by a foreigner upon a foreigner on a vessel that has no national character, why can the United States not also prosecute drug trafficking committed by a foreigner on such a vessel? Nevertheless, the sometimes challenging syntax in Holmes, Furlong, and Klintock, plus the possibility that international law itself now differs materially from international

law as understood 200 years ago, counsel against resting our conclusion solely on those cases if we do not need to do so. And we do not.

No other circuit has held that conduct aboard a stateless vessel seized by the United States on the high seas may not be prosecuted as conduct committed on United States territory.[3] See United States v. Moreno-Morillo, 334 F.3d 819, 828 (9th Cir. 2003) (noting that "a showing of statelessness effectively moots the nexus requirement because those aboard stateless vessels effectively have waived their right to object to the exercise of jurisdiction over them by United States courts"); see also Marino-Garcia, 679 F.2d at 1383 (concluding that stateless status "makes the vessel subject to action by all nations proscribing certain activities aboard stateless vessels and subjects those on board to prosecution for violating th[ose] proscriptions"); Juda, 46 F.3d at 967 (recognizing no distinction between the right to seize stateless vessels and the right to prosecute persons on board them); Alvarez-Mena, 765 F.2d at 1266-67 (same).

While there is no unanimity among scholars on this point, see Douglas Guilfoyle, "The High Seas," in The Oxford Handbook on the Law of the Sea 218 (Rothwell et al. eds. 2015), the

---

[3] Because we sustain MDLEA as applied to Aybar, we need not decide whether and to what effect MDLEA should be construed as reaching even more broadly.

longstanding unanimity among United States courts is especially significant, as "the state practice of the United States contributes to the development of customary international law when followed out of a sense of international legal right or obligation." Restatement (Fourth) § 402 cmt. b; see also id. n.2.

Treating conduct on stateless vessels in this manner furthers a basic aim of international law to achieve order on the high seas by disincentivizing the use of stateless vessels. Marino-Garcia, 679 F.2d at 1382-83. This approach also yields significant practical benefits, such as reducing complications when, for example, officials of the seizing nation are needed as witnesses in a subsequent prosecution of offenses committed on the vessel. Moreover, those who set out in stateless vessels cannot be said to possess the same reasonable expectation of sanctuary from foreign jurisdiction under international law as those on a flagged vessel would. See Caicedo, 47 F.3d at 372 (distinguishing properly flagged vessels, which have a "legitimate expectation" of being subject only to the laws of the flag state, from stateless vessels, which "subject themselves to the jurisdiction of all nations" such that a state's exercise of jurisdiction over them cannot, categorically, be said to be "arbitrary or fundamentally unfair"); see also Moreno-Morillo, 334 F.3d at 828; Marino-Garcia, 679 F.2d at 1382 (describing stateless vessels as "international pariahs" having "no internationally recognized right to navigate

freely on the high seas" and finding no categorical limits to the exercise of jurisdiction over stateless vessels under international law). Simply put, if a person intent on drug trafficking on the high seas wants to be prosecuted in his own country should he be caught, he should sail under that country's flag.

## D.

Aybar contends that, notwithstanding the foregoing, his prosecution was prohibited by other, more specific rules and undertakings governing jurisdiction and the high seas. As we will explain, we find that the relevant and more specific rules and undertakings are entirely consistent with our conclusion that Aybar was properly subject to prosecution in the United States for his conduct on board the stateless vessel.

## 1.

Aybar first points to the 1988 United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances ("UN Drug Trafficking Convention"), U.N.T.S. 27627 (1988), which was adopted to give effect to UNCLOS's call on states to "cooperate in the suppression of illicit traffic in narcotic drugs" on the high seas, UNCLOS art. 108. Specifically, he points out that the UN Drug Trafficking Convention does not explicitly address the possibility of states exercising jurisdiction over persons found engaging in drug trafficking on stateless vessels on

the high seas.  See UN Drug Trafficking Convention art. 17.  But it does not rule out such prosecutions either.  To the contrary, at least one United Nations body has suggested that states may exercise jurisdiction under the convention over persons found engaging in illegal activities on stateless vessels, in combination with domestic sources of authority.  See Commission on Crime Prevention and Criminal Justice, Outcome of the Expert Group Meeting on Transnational Organized Crime at Sea, held in Vienna, Austria, on 5-6 April 2016, U.N. Doc. E/CN.15/2016/CRP.3, ¶ 18 (May 19, 2016) (recognizing debate over enforcement activity against perpetrators found on stateless vessels but observing that "if a State is party to the [UN Drug Trafficking Convention], it should exercise jurisdiction over vessels without nationality").

To implement the UN Drug Trafficking Convention, several European states adopted the 1995 Council of Europe Convention on Illicit Traffic by Sea.  That convention provides further support for the proposition that international law welcomes prosecutions by the seizing nation of those found engaged in drug trafficking on stateless vessels:  It not only allows but requires parties to prosecute persons found trafficking drugs on stateless vessels.  See Agreement on Illicit Traffic by Sea, Implementing Article 17 of the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances art. 3, C.E.T.S. 156 (1995) (mandating that "each Party shall take such measures as may

- 22 -

be necessary to establish its jurisdiction over the relevant offen[s]es committed on board a vessel which is without nationality, or which is assimilated to a vessel without nationality under international law").[4]

Several other international law instruments similarly leave open the possibility of states taking law enforcement action against persons found on stateless vessels. Such instruments typically use language indicating that states may take action "in accordance with relevant domestic and international law" after searching a stateless vessel on the high seas. See Brownlie's Principles, supra, at 291 (explaining that this language "perpetuates the ambiguity regarding the exercise of prescriptive jurisdiction and enforcement over stateless vessels"). For example, the 2000 Migrant Smuggling Protocol indicates with respect to vessels without nationality that "[i]f evidence confirming the suspicion [of smuggling] is found," the boarding State "shall take appropriate measures in accordance with relevant domestic and international law." See Protocol Against the Smuggling of Migrants by Land, Sea and Air, Supplementing the

---

[4] See also Agreement Concerning Co-Operation in Suppressing Illicit Maritime Air Trafficking in Narcotic Drugs and Psychotropic Substances in the Caribbean Area (not yet in force) (signed by the United States on April 10, 2003) (providing the same).

United Nations Convention Against Transnational Organized Crime art. 8(7), U.N.T.S. 2241 (2000) (emphasis added).

Likewise, the United Nations Straddling Fish Stocks Agreement suggests that states may take enforcement action against stateless fishing vessels for illegal fishing "in accordance with international law," but does not specify what such action might entail. See Agreement for the Implementation of the Provisions of the United Nations Convention on the Law of the Seas of 10 December 1982 Relating to the Conservation and Management of Straddling Stocks and Highly Migratory Fish Stocks art. 21(17), Conference on Straddling Fish Stocks and Highly Migratory Fish Stocks, 6th Sess., U.N. Doc. A/CONF.164/37 (Sept. 8, 1995); see also Douglas Guilfoyle, Shipping Interdiction and the Law of the Sea 108 (2009) (observing that this language "accommodat[es] divergent views as to prescriptive and enforcement jurisdiction over stateless vessels at general international law"). Moreover, various regional fisheries organizations have encouraged states to take legal action where evidence is found of illegal fishing on stateless vessels.[5] See Guilfoyle, Shipping Interdiction and the

_____

[5] See, e.g., International Commission for the Conservation of Atlantic Tunas (ICCAT), Recommendations by ICCAT on Vessel Sightings, ¶ 3 (June 20, 2020) ("If the vessel is confirmed to be without nationality, a competent authority . . . is encouraged to inspect the vessel, consistent with international law and, if evidence so warrants, the Contracting Party is encouraged to take such action as may be appropriate, in accordance with international law."); Northeast Atlantic Fisheries Commission, Scheme of Control

- 24 -

Law of the Sea, supra, at 129 (explaining that the Northeast Atlantic Fisheries Commission Scheme "appears to directly encourage the adoption of national laws permitting extraterritorial enforcement action against stateless vessels," even if, like the UN Drug Trafficking Convention, it does not itself provide for such enforcement measures); Rosemary Rayfuse, Non-Flag State Enforcement in High Seas Fisheries 330-31 (2004).

Moreover, certain bilateral instruments to which the United States is a party explicitly leave open the possibility of states taking enforcement action against persons found on board stateless vessels where the evidence so warrants. See, e.g., Agreement between the Government of the United States of America and the Government of the Dominican Republic Concerning Maritime Counter-Drug Operations, U.S.-Dom. Rep., Mar. 23, 1995, T.I.A.S. No. 12620 (providing that counter-drug operations pursuant to the agreement may be carried out against vessels "without nationality," but also noting under the protocol to the agreement that law enforcement personnel are to act in accordance with

_____

and Enforcement, art. 38(2) (Feb. 7, 2020); see also Indian Ocean Tuna Commission, Resolution 16/05 on Vessels Without Nationality (Sept. 27, 2016); United Nations Food and Agriculture Organization, Implementation of the International Plan of Action to Prevent, Deter and Eliminate Illegal, Unreported, and Unregulated Fishing 14-15 (2002) ("Taking action against [stateless] vessels should be a high priority, because their very statelessness frustrates the primary means to control fishing activity on the high seas -- through flag State jurisdiction.").

international law when engaging in boardings and searches); Agreement between the United States of America and Cyprus Concerning Cooperation to Suppress the Proliferation of Weapons of Mass Destruction, Their Delivery Systems, and Related Materials by Sea, U.S.-Cyp., July 25, 2005, T.I.A.S. 06-112 (including stateless vessels among the vessels against which operations may be undertaken under the agreement); Agreement between the United States of America and Belize Concerning Cooperation to Suppress the Proliferation of Weapons of Mass Destruction, Their Delivery Systems, and Related Materials by Sea, U.S.-Blz., Oct. 29, 2005, T.I.A.S. 05-1019 (same); see also United States v. Bravo, 489 F.3d 1, 4 (1st Cir. 2007) (recounting that the claimed flag state could not confirm registry of the vessel and authorized the United States to proceed with law enforcement action under "international law").

**2.**

Aybar insists that UNCLOS nevertheless prohibits his prosecution. He relies on Article 110, which provides a right to visit ships suspected of being without nationality and to search those ships if suspicion of statelessness remains after checking the ship's documents. See also Aybar-Ulloa, 913 F.3d at 62-63 (Torruella, J., dissenting in part) (arguing that the unilateral extension of domestic jurisdiction over a stateless vessel on the high seas without a nexus violates UNCLOS). But in recognizing a right to visit certain ships, including a ship "without

- 26 -

nationality," Article 110 does not prohibit the prosecution of those on board. It simply remains silent as to whether and when the visiting nation may prosecute persons found on the ship.

Aybar argues that we should draw a negative inference from that silence because other articles of UNCLOS do contain express grants of authority to penalize persons found on certain vessels. For example, Article 105 authorizes the arrest and punishment of persons found on pirate ships. Similarly, Articles 99 and 109 expressly grant the power to penalize persons for engaging in slavery and unauthorized broadcasting, respectively. We reject the negative inference Aybar would have us draw for two reasons.

First, and most simply, there are obvious differences between the examples given and that of a stateless vessel, undercutting any negative inference that could be drawn from the presence of express grants in some articles but not others. For starters, a ship engaged in piracy may retain its nationality. UNCLOS art. 104. So there was a reason for Article 105 to expressly confirm that any state can exercise universal jurisdiction to seize and prosecute individuals on such a ship -- otherwise, it might have been possible to argue that only the ship's flag state would be able to seize and prosecute those individuals. Under this reading, Article 105 grants no new authority. Similarly, because vessels that engage in unauthorized

broadcasting can retain their nationality, an exception was needed to overcome the presumption of exclusive flag-state jurisdiction where it was desirable for impacted states to have the possibility of arresting "person[s] or ship[s] engaged in" this activity. See id. art. 109(4) (providing that states receiving transmissions or suffering from interference may exercise their jurisdiction to prosecute unauthorized broadcasting). Further, because slave ships also generally retain their nationality, Article 99 had to expressly impinge on flag-state jurisdiction in order to declare that enslaved persons found on any ship are ipso facto free. Without these provisions -- which codify limitations on the rights of flag states where their ships engage in conduct of severe concern to the international community -- other states may have presumed that their hands were tied.

Not so in the case of the stateless vessel. The presumption of flag-state jurisdiction, which arguably made the express grants of authority in Articles 99, 105, and 109 necessary, simply does not apply where the vessel at issue is stateless. Rather, as we have explained, stateless vessels are treated as subject to the exercise of authority by any nation. Accordingly, the absence of an express grant of authority to seize and prosecute persons on board a stateless vessel in Article 110 does not, on its own, establish that Aybar's seizure and prosecution are prohibited by UNCLOS.

Second, Aybar's argument cannot be squared with the approach taken in the international instruments and undertakings we have described. If a categorical rule against the extension of domestic jurisdiction over stateless vessels could be found in UNCLOS Article 110, it is unlikely that subsequent instruments mentioning stateless vessels could avoid it or that their drafters would have been unaware of it. Instead, it appears that in the decades since UNCLOS was concluded, the relevant international organizations and actors have resolved to leave the issue to the judgment of states. See Guilfoyle, "The High Seas," supra, at 218 (explaining that "[t]reaty law is silent" on the extension of national jurisdiction over stateless vessels without a nexus and "sometimes deliberately ambiguous" such that existing treaty language "covers divergent national (and academic) interpretations").

Our reading of international law does not render the United States an outlier. Other nations have also adopted laws and regulations permitting exercises of domestic jurisdiction over stateless vessels and persons found on board them. See United Nations Food and Agriculture Organization, Implementation of the International Plan of Action to Prevent, Deter and Eliminate Illegal, Unreported, and Unregulated Fishing 15 (2002) (discussing laws adopted by Canada and Norway to extend jurisdiction over stateless vessels); see also Fisheries Jurisdiction Case (Spain v.

Canada), Jurisdiction, Judgment, 1998 I.C.J. Rep. 432, ¶¶ 19, 61 64, 75 (Dec. 4) (describing Canada's seizure of a vessel under its Coastal Fisheries Protection Act, adopted to cover high seas areas governed by the Northwest Atlantic Fisheries Organization, and the subsequent arrest and prosecution of its master for illegal fishing under that law, as well as Spain's response that such law enforcement actions were permissible only if the vessel were stateless); Molvan v. Attorney-General for Palestine, A.C. 351 (1948); Guilfoyle, "The High Seas," supra, at 218 (noting that the United States and United Kingdom have historically taken the view that no nexus is required to extend national jurisdiction over a stateless vessel).[6] That there is not even more evidence of similar state practices engenders no surprise, given the practical difficulties of seizing ships on the high seas. "[W]hile international law may allow states to arrest stateless vessels, states may not yet have appropriated that right unto themselves." Rayfuse, supra, at 330 (explaining that the absence of a widespread practice of arresting and prosecuting stateless fishing vessels may "reflect[] . . . the reality that few states have the physical capability to arrest these vessels on the high seas" and that

_____

[6] See generally Coastal Fisheries Protection Act (R.S.C., 1985, c. c-33) § 5.5 (Canada); Marine Resources Act no. 37 (6 June 2008) (Norway), available at https://www.fiskeridir.no/English/ Fisheries/Regulations/The-marine-resources-act; Policing and Crime Act 2017, c.3 § 84(1)(b) (United Kingdom), available at https://www.legislation.gov.uk/ukpga/2017/3/section/84.

"states may lack a basis in their domestic legal framework permitting their authorities to take such action").

## E.

We add, finally, several caveats.

First, our holding makes no attempt to assert universal jurisdiction over drug trafficking offenses. The holding does not apply at all to the large majority of vessels sailing on the high seas. Rather, it applies only to vessels flouting order and custom on the high seas by eschewing the responsibilities and protections of the flag-state system.

Second, we do not suggest that international law does not apply to the seizure of the vessel or that persons on board such vessels fall outside of the protection of international law. See Rayfuse, supra, at 57 (explaining that "a ship without nationality[] is not necessarily a ship without law[,] . . . [b]ut it is a ship without protection" (quoting D.P. O'Connell, 2 The International Law of the Sea 755 (1984))). Fundamental principles of customary international human rights law, and requirements of due process under United States law, may well still apply in circumstances not present in this appeal. See Brownlie's Principles, supra, at 285 (noting that stateless ships "are not outside the law altogether," as "their occupants are protected by elementary considerations of humanity"); Maarten Den Heijer, Europe and Extraterritorial Asylum 238 (2012) (recognizing that

the "taking of coercive measures" against stateless vessels "is likely to come within the ambit of human rights law"); see also United States v. Ballestas, 795 F.3d 138, 148 (D.C. Cir. 2015); United States v. Yousef, 327 F.3d 56, 111-12 (2d Cir. 2003) (citing United States v. Davis, 905 F.2d 245, 248-49 (9th Cir. 1990)); Cardales, 168 F.3d at 553.

While the fundamental "arbitrariness or unfairness" of a prosecution may depend in some part on notions of "fair warning" under either domestic or international law, see United States v. Van Der End, 943 F.3d 98, 106 (2d Cir. 2019), such "fair warning" has certainly been given in the case of drug trafficking. Although not a crime that gives rise to universal jurisdiction, see Restatement (Fourth) § 413 n.1 (explaining that "universal jurisdiction is limited to the most serious offenses about which a consensus has arisen for the existence of universal jurisdiction"); United States v. Cardales-Luna, 632 F.3d 731, 740-41 (Torruella, J., dissenting), drug trafficking has long been regarded as a serious crime by nearly all nations. See United Nations Treaty Depositary, Status of the United Nations Convention against Illicit Traffic in Narcotics (accessed August 9, 2020) (indicating that 191 states are party to the UN Drug Trafficking Convention); see also 46 U.S.C. § 70501(1) (recognizing that "trafficking in controlled substances aboard vessels is a serious international problem" that "is universally condemned").

Third, we opt not to decide one way or the other whether the United States may prosecute a foreign citizen engaged in drug trafficking on a stateless vessel where the United States never boarded and seized the vessel. Nor do we reach the question of whether the MDLEA by its own terms reaches such a situation. In this case the law has been applied to a person apprehended on board the stateless vessel when stopped and boarded by United States Coast Guard officers. Although the government seeks a broader ruling in its supplemental briefing, it does not abandon its argument that "MDLEA was not unconstitutional as applied to this case because Aybar's stateless vessel was intercepted on the high seas" by the United States. And resolving this "as applied" argument is all that is necessary to dispose of this appeal.

Finally, nothing in our reasoning forecloses a successful claim of diplomatic protection by a foreign state, should a foreign state make such a petition on behalf of its national. See Barnes, supra, at 315; Churchill & Lowe, supra, at 172. What we hold, instead, is that international law does not generally prohibit the United States from prosecuting drug traffickers found on a stateless vessel stopped and boarded by the United States on the high seas as if they had been found on a United States vessel subject to the territorial jurisdiction of the United States. Therefore, even if Congress's power under the

Define and Punish Clause is cabined by international law, Aybar's prosecution under MDLEA would not exceed any such limitation.

## III.

That leaves only Aybar's challenge to his sentence. For the reasons stated in the panel opinion, we vacate and remand for resentencing under the Sentencing Commission's clarified guidance, as reflected in Amendment 794. See Aybar-Ulloa, 913 F.3d at 56-57 (citing United States v. Sarmiento-Palacios, 885 F. 3d 1, 6 (1st Cir. 2018)).

## IV.

For the foregoing reasons, we **affirm** the defendant's conviction, **vacate** the defendant's sentence, and **remand** for resentencing.

**- Concurring Opinion Follows -**

**BARRON, Circuit Judge, concurring in the judgment.**
Johvanny Aybar-Ulloa ("Aybar") contends that Article I, Section 8, Clause 10 of the United States Constitution, which authorizes Congress to "define and punish . . . Felonies committed on the high Seas," provides the sole constitutional source of power for the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70501-70508. He further argues that there is an implicit limit on this power, rooted in the law of nations, and that this limit restricts Congress's authority to rely on this Clause to extend our country's domestic criminal laws to foreign nationals who violate them while they are outside the territorial jurisdiction of the United States. He therefore contends that his conviction under the MDLEA is unconstitutional, because he is a foreign national who is alleged to have engaged in drug trafficking while in international waters and on a vessel that is not registered to the United States.

In pressing this contention, Aybar asserts that his prosecution for violating the MDLEA cannot be deemed to accord with international law on the ground that the offense for which he was convicted is a crime against all nations. He emphasizes that this is so because international law does not recognize drug trafficking as a universal jurisdiction offense. He further asserts that there is no basis under international law for

permitting the United States to criminalize the conduct for which he was convicted based on an assertion of what is known as protective jurisdiction. This is so, he contends, because there was no nexus between his drug trafficking and the United States, as the vessel that he was on left from one foreign country and was headed to another. See United States v. Robinson, 843 F.2d 1, 3-4 (1st Cir. 1988) (Breyer, J.) (noting "forceful argument" against application of protective principle to encompass drug trafficking on the high seas).

There is a fair amount of support for the contention that Article I's Define and Punish Clause is impliedly limited by the law of nations in ways that constrain Congress's authority to rely on that Clause to subject foreign nationals to our criminal laws for conduct that they engage on while they are on foreign vessels -- even when those vessels are on the high seas. See United States v. Furlong, 18 U.S. (5 Wheat.) 184, 197-98 (1820) ("Congress . . . ha[s] no right to interfere" with other nations by "punishing [murders by foreign nationals] when committed within the [foreign] jurisdiction, or, (what is the same thing,) in the vessel of another nation."); see also Congressman John Marshall, Speech to the House of Representatives (Mar. 7, 1800), in 10 Annals of Cong. 607 (1800) (hereinafter "Speech of John Marshall") (arguing that the Define and Punish Clause cannot authorize federal "jurisdiction over offences, committed on board a foreign ship

against a foreign nation" on the high seas); Justice James Wilson, Charge to the Grand Jury of the Circuit Court for the District of Virginia (May 23, 1791), reprinted in 2 The Documentary History of the Supreme Court of the United States, 1789-1800, at 179 (Maeva Marcus ed., 1988) (suggesting that "no state or states can; by treaties or municipal laws, alter or abrogate the law of nations" to the extent of reaching the crime of murder by a foreigner aboard a foreign flag ship).[7]  But, without disputing that point, and without relying on either a claim that the crime involved here qualifies as a universal jurisdiction offense or that the MDLEA is the product of our nation's valid assertion of its protective jurisdiction, the majority nevertheless rejects Aybar's constitutional challenge.

The majority does so because, it rightly points out, although Aybar was on the high seas while he was in possession of the cocaine that led to his MDLEA charges, he was not at that time on a foreign vessel.  Instead, he was on a stateless one that our

---

[7] In fact, the United States itself early on took the position before the Supreme Court that the Define and Punish Clause was subject to this limitation, even though it takes the opposite view here.  See United States v. Palmer, 16 U.S. (3 Wheat.) 610, 620 (1818) (argument of Mr. Blake on behalf of the United States) ("A felony, which is made a piracy by municipal statutes, and was not such by the law of nations, cannot be tried by the courts of the United States, if committed by a foreigner on board a foreign vessel, on the high seas; because the jurisdiction of the United States, beyond their own territorial limits, only extends to the punishment of crimes which are piracy by the law of nations.").

national authorities had interdicted in accord with international law. Thus, in the majority's view, Aybar was within the territorial jurisdiction of the United States when he violated the MDLEA no less than if he had been on a ship flying our nation's flag. See Slip Op. 4-5, 10-14. For that reason, the majority concludes, the premise on which Aybar's constitutional challenge rests -- that he violated the MDLEA while he was outside the territorial jurisdiction of the United States -- is mistaken. See id. at 33-34.

I do not disagree with the majority that Aybar's constitutional challenge must be rejected. I write separately, however, because I reach that conclusion through a different, albeit somewhat related, line of reasoning.

**I.**

The majority observes that, under the law of nations, a foreign national on a U.S.-flagged vessel is within the territorial jurisdiction of the United States even when that vessel is in international waters. Id. at 4-5, 14-15. The majority also notes that, under the law of nations, a country's war or clearly marked law enforcement ship may board and search a vessel in international waters when there is adequate reason to suspect that the vessel is stateless. Id. at 12-13; see, e.g., Restatement (Third) of the Foreign Relations Law of the United States § 522(2)(b) & n.7 (1987) (hereinafter "Restatement (Third)") ("[A] warship or clearly-

marked law enforcement ship of any state may board . . . a ship . . . if there is reason to suspect that the ship . . . is without nationality"; "[a] stateless vessel is not entitled to . . . protection . . . against boarding and search."); Brownlie's Principles of Public International Law 285, 292 (James Crawford ed., 9th ed. 2019) (hereinafter "Brownlie's Principles") (noting statelessness as a "circumstance[] in which a warship may exercise the right of visit on the high seas"); Malcolm N. Shaw, International Law 457 (8th ed. 2017) ("A ship that is stateless, and does not fly a flag, may be boarded and seized on the high seas.").

But, although the Third and Fourth Restatement of the Foreign Relations Law of the United States clearly establish the soundness of these twin propositions, see Restatement (Third) §§ 501 cmt. c, 502(2) & cmt. d, 522(2)(b) & n.7; Restatement (Fourth) of the Foreign Relations Law of the United States § 408 cmt. b & n.3 (2018), I do not read them to go further and establish that the prevailing view of the law of nations is that the interdicting country acquires the same territorial jurisdiction over the vessel's occupants as it acquires over the vessel itself. In fact, as the majority recognizes, Slip Op. 19, experts in international law have long noted the disagreement that exists over that very view, even in the case in which the interdicting country's officials have boarded the vessel.  See Brownlie's

- 39 -

Principles at 292 (noting "two schools of practice" on the question of exercising jurisdiction over stateless vessels, one of which is the U.S. practice that also permits criminal prosecution of those aboard and the other which requires "some further jurisdictional nexus," and explaining that the latter "position [is] more consistent with existing treaty practice"); Douglas Guilfoyle, "The High Seas," in The Oxford Handbook of the Law of the Sea 216, 218 (Donald R. Rothwell et al. eds. 2015) ("[S]cholarly views vary" on "[t]he consequences of statelessness," and there are equally "divergent national . . . interpretations."); Douglas Guilfoyle, Shipping Interdiction and the Law of the Sea 17-18 (2009) (similar). Nor have these commentators suggested that, insofar as there is a prevailing view in this debate, it is one that is at odds with the understanding that Aybar asks us to conclude that international law embraces. See R.R. Churchill & A.V. Lowe, The Law of the Sea 214 (3d ed. 1999) ("[I]t has been held . . . that [stateless] ships enjoy the protection of no State," but the "better view appears to be that there is [still] a need for some [additional] jurisdictional nexus in order that a State may extend its laws to those on board a stateless ship and enforce the laws against them." (emphases added)); Richard Barnes, "The International Law of the Sea and Migration Control," in Extraterritorial Immigration Control: Legal Challenges 130-33 (B. Ryan and V. Mitsilegas eds., 2010) (noting that "US jurisprudence"

- 40 -

notwithstanding, "it is not at all clear that attempts to circumvent the requirement for a jurisdictional nexus . . . would be consistent with the law of the sea"; "the fact that right of visit and matters of enforcement are treated separately in the [United Nations Convention on the Law of the Sea] suggests that a positive right of visit does not imply wider enforcement powers").

Thus, insofar as the majority's understanding of the scope of territorial jurisdiction over Aybar under the law of nations is tied to the fact that the stateless vessel that he was on had been seized and boarded by the United States' authorities in the course of their attempt to determine the nation (if any) to which the vessel belonged, see Slip Op. 19 n.3, 33, I cannot find any clear support for that understanding in either the pertinent Restatements or the relevant learned commentary. I should add that I also am not aware of any precedent from U.S. courts that would provide such support.

There is precedent from our country's courts that stakes out a more expansive view of territorial jurisdiction under the law of nations than Aybar would have us countenance. But, that precedent, as I read it, does not tie that more expansive view to a showing that the officials from the nation that is claiming territorial jurisdiction over the foreign national on a stateless vessel in international waters had seized and boarded the vessel in question pursuant to their recognized right under international

law to determine its status. Rather, that precedent appears to hold that foreign nationals on stateless vessels in international waters are subject to domestic prosecution by the United States for their conduct on board them pursuant to an assertion of the United States' territorial jurisdiction simply because there is support for all nations exercising such jurisdiction over vessels that are both stateless and in such waters. See, e.g., United States v. Rendon, 354 F.3d 1320, 1325 (11th Cir. 2003) ("Because stateless vessels do not fall within the veil of another sovereign's territorial protection, all nations can treat them as their own territory and subject them to their laws." (quoting United States v. Caicedo, 47 F.3d 370, 373 (9th Cir. 1995))); Caicedo, 47 F.3d at 373 ("Such vessels are 'international pariahs' . . . [and] subject themselves to the jurisdiction of all nations 'solely as a consequence of the vessel's status as stateless.'" (quoting United States v. Marino-Garcia, 679 F.2d 1373, 1382-83 (11th Cir. 1982))); United States v. Victoria, 876 F.2d 1009, 1010 (1st Cir. 1989) (Breyer, J.) ("[A]s United States courts have interpreted international law, that law gives the 'United States authority to treat stateless vessels as if they were its own.'" (alteration omitted) (quoting United States v. Smith, 680 F.2d 255, 258 (1st Cir. 1982))); United States v. Pinto-Meija, 720 F.2d 248, 260-61 (2d Cir. 1983) ("[S]tateless vessels

on the high seas are, by virtue of their statelessness, subject to the jurisdiction of the United States.").

For these reasons, I see no clear support in either case law or commentary for the comparatively modest proposition that persons on stateless vessels that a foreign country's officials have seized and boarded pursuant to their recognized right to visit it are subject to that country's territorial jurisdiction under international law. Instead, I find no judicial precedent supporting that particular proposition, and much debate within the relevant commentary about its soundness.

There is another reason that prevents me from signing on to the majority's analysis. This reason has to do with the fact that I understand the MDLEA to have been premised on a broader theory of territorial jurisdiction under the law of nations than the majority is willing to embrace. That broader theory makes neither the physical presence of our authorities on a stateless vessel in the high seas or those authorities' interaction with that vessel of any legal significance in determining whether the occupants on that vessel come within our country's territorial jurisdiction. Instead, that broader theory makes the fact that the occupants are on a vessel that is both stateless and in international waters in and of itself the reason that their conduct while on board may be said to occur within the territorial jurisdiction of the United States. The notion that this more

expansive theory of territorial jurisdiction under international law grounds the MDLEA finds support in the text of the statute itself. The MDLEA expressly criminalizes drug trafficking on any "vessel subject to the jurisdiction of the United States," 46 U.S.C. § 70503(e)(1), and then proceeds to define such vessels expansively to "include[]" not just those whose crews fail to make a claim that they belong to another nation "on request of an officer of the United States," id. § 70502(d)(1)(B) (deeming such vessels to be "without nationality," i.e., stateless), but also those vessels aboard which the crew's "claim of registry . . . is denied" or is "not affirmatively and unequivocally" affirmed "by the nation whose registry is claimed," without reference to a request being made by a United States officer at all, id. § 70502(d)(1)(A), (C) (same). In these respects, the MDLEA notably fails to make the fact that U.S. authorities either have boarded the vessel or even interacted with the vessel's crew at the time of the commission of the offense a precondition for the vessel being subject to the jurisdiction of the United States. As a result, the MDLEA, by its terms, appears to make the bare fact that a foreign national engages in drug trafficking while on a stateless vessel in international waters a trigger for subjecting the foreign national to the reach of our domestic criminal laws.

To be sure, Aybar does not dispute on appeal that his vessel was in fact boarded by the U.S. authorities who interdicted

it.  But, it is not evident to me that the jurisdictional basis for his MDLEA conviction was premised on any such finding, as it is not evident to me that any legal significance was attributed to that fact in convicting him of violating the MDLEA.[8]

For that reason, it is not surprising to me that the government describes the question concerning the scope of

---

[8] Aybar's indictment charging him with drug trafficking under the MDLEA mentioned only that he did so "on board a vessel subject to the jurisdiction of the United States; that is, a vessel without nationality," without noting the physical presence of U.S. officials on board the vessel at the time of the offense (or even any U.S. "interaction" with the vessel or the crew), and he did not admit to the vessel having been boarded in pleading guilty to the offense charged in the indictment, as he was not asked to do so, given that none of the elements of the offense made the fact of the boarding of legal relevance to his commission of it.  The government's submissions to the District Court concerning whether Aybar was on board a vessel subject to U.S. jurisdiction, moreover, did not purport to make the finding that he was dependent on the fact of the vessel having been boarded by such officials.  Finally, the District Court rejected Aybar's constitutional challenge on the ground that the United States had territorial jurisdiction over him while he possessed the cocaine at issue without purporting to premise that conclusion on the fact that U.S. officials had actually boarded his vessel.  Thus, I am dubious that a conclusion that his conviction may be affirmed against this international-law-based constitutional challenge to Congress's Article I power is sustainable on the basis of the vessel having been boarded rather than on the more expansive theory that made his presence on a stateless vessel in international waters itself dispositive of whether he was subject to our nation's jurisdiction.  Cf. United States v. Lopez, 514 U.S. 549, 559 (1995) (holding that the Gun-Free School Zones Act "exceeds the authority of Congress to 'regulate Commerce'" as it "neither regulates a commercial activity nor" "contains [a] jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce" (emphasis added) (quoting U.S. Const. Art. I § 8 cl. 3)); Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1332-34 (2000).

territorial jurisdiction that Aybar's constitutional challenge to his MDLEA conviction implicates in terms that render both the physical presence of our authorities on his vessel and their interaction with it legally irrelevant. In fact, it would be surprising to me if the government were to embrace the view that, to ensure that the MDLEA would be enforced against a foreign national consonant with the law of nations, our law enforcement authorities must board the defendant's vessel (or even make contact with it) while he is both on it and in possession of the drugs. Such a view would appear to require the conclusion that our government could avoid flouting the law of nations in enforcing the MDLEA only by accepting that a foreign national on a stateless vessel on the high seas could protect himself from the statute's reach merely by dumping contraband from his vessel (stateless though it is conceded to be) as soon as a ship carrying our country's law enforcement personnel is in view. Yet, in fact, the government has enforced the MDLEA even when the defendant had finished possessing the drugs at issue before U.S. authorities had made any contact with the stateless vessel on which the offense had occurred. See, e.g., Rendon, 354 F.3d at 1322-23; Caicedo, 47 F.3d at 371.

Of course, the fact that the government makes this broader assertion of territorial jurisdiction in asking us to reject Aybar's constitutional challenge does not mean that the

- 46 -

government's view of the scope of the United States' territorial jurisdiction under international law is correct. The Restatements and commentary described above provide no clear support for the notion that, under the law of nations, all countries are entitled to assert territorial jurisdiction over any foreign national in international waters who is on board a vessel that is stateless simply because that vessel is in those waters and does not belong to any nation. In fact, as I have explained, those materials do not even provide clear support for the relatively narrower but still broad proposition that a nation that exercises its right to visit a vessel in international waters that it suspects is stateless automatically acquires the right to assert domestic criminal jurisdiction over that vessel's foreign-national occupants.

I have noted above that a number of United States Circuit Courts have endorsed the view that, under the law of nations, a person's presence on a stateless vessel in international waters is in itself enough to make that person subject to a foreign nation's domestic criminal laws for the conduct in which he engages while on board -- if, that is, the nation chooses to apply those laws to him. See, e.g., Rendon, 354 F.3d at 1325; Caicedo, 47 F.3d at 372; Pinto-Mejia, 720 F.2d at 260-61. Thus, it is true that these courts have signed on to the government's expansive view of territorial jurisdiction under the law of nations.

But, in doing so, these courts have supported that view merely by citing to other circuit-level precedents, see, e.g., Rendon, 354 F.3d at 1325; Caicedo, 47 F.3d at 372; Victoria, 876 F.2d at 1010-11, or by treating international law authorities that clearly establish that a nation has territorial jurisdiction over a vessel in international waters that is stateless as if such authorities also establish that a nation has territorial jurisdiction over the foreign nationals who are on such a vessel, see Pinto-Mejia, 720 F.2d at 260-61; Marino-Garcia, 679 F.2d at 1382-83; Smith, 680 F.2d at 258. For that reason, I do not see how these precedents help to demonstrate that the law of nations is what the government says it is.

## II.

The lack of clear authority for either the government's (or the majority's more modest but still broad) view of territorial jurisdiction under the law of nations does not necessarily compel us to hold that the United States lacks the constitutional authority to extend the MDLEA to Aybar's conduct. Even if we were to assume that the law of nations places limits on Congress's power under the Define and Punish Clause to subject foreign nationals on foreign vessels in international waters to our domestic criminal laws, and even if we were to assume that the United States may not assert protective jurisdiction over drug trafficking merely because it occurs on stateless vessels in international waters,

- 48 -

see Robinson, 843 F.2d at 3-4, it still may be that we are in no position to conclude that the application of the MDLEA to Aybar's conduct in this case would violate international law -- and thus in no position to conclude that such application would transgress Article I.

A rule of international law that would insulate foreign nationals on stateless vessels on the high seas from domestic criminal jurisdiction would raise practical difficulties for law enforcement authorities -- and not only for those from our country. See Slip Op. 20-21. In light of those difficulties and the degree of legal uncertainty that exists in this realm, it may be that it would be proper for us to defer to our political branches' judgment as to what the law of nations permits here.[9] Cf. United States v.

---

[9] Much like Congress in the MDLEA, the Executive Branch has before taken the position that our laws may punish drug trafficking by foreign nationals aboard stateless vessels in the high seas consistently with international law. See, e.g., Stopping "Mother Ships" -- A Loophole in Drug Enforcement: Hearing on S. 3437 Before the Subcomm. to Investigate Juvenile Delinquency of the H. Comm. on the Judiciary, 95th Cong. 28 (1978) (statement of Morris Busby, Acting Deputy Assistant Secretary, Dep't of St. Off. of Oceans Aff.) (explaining in supporting a precursor bill to the MDLEA that "making it a crime to possess drugs on the high seas with an intent to distribute, whether or not the intent was to distribute the[] drugs in the United States" "where you have a ship without any nationality on the high seas" "would comport with international law"); Coast Guard Drug Law Enforcement: Hearing on H.R. 2538 Before the Subcomm. on Coast Guard and Navigation of the H. Comm. on Merchant Marine and Fisheries, 96th Cong. 55 (1979) (statement of Morris Busby, Director, Dep't of St. Off. of Ocean Aff.) (elaborating that international law did, in his Department's view, create "an exception which allows us to board a vessel on the high seas which is without nationality," and further

Smith, 18 U.S. (5 Wheat.) 153, 159 (1820) (explaining that "there is a peculiar fitness in giving the power to define as well as to punish; and there is not the slightest reason to doubt that this consideration had very great weight in producing the phraseology in question"); id. at 169-72 (Livingston, J., dissenting) ("The special power here given to define . . ., can be attributed to no other cause, than to the uncertainty . . . in the law of nations, and which it must have been the intention of the framers of the constitution to remove, by conferring on the national legislature the power which has been mentioned.").

It may also be that, as the majority suggests, see Slip Op. 19-21, there is a "general usage and practice of nations," Smith, 18 U.S. (5 Wheat.) at 160-61, that supports the United States' position. Other nations do not appear to have affirmatively resisted our country's assertion of this expansive view of territorial jurisdiction, and we are dealing with the peculiar context of the high seas. Perhaps, then, it would be prudent to reject Aybar's constitutional challenge to his

"recommend[ing] . . . that [the United States] make it a [prosecutable] violation for [drug trafficking] to occur on board a vessel which is stateless"; "[w]hile ordinarily the United States does not favor a unilateral extension of jurisdiction . . . over the activities of non-U.S. citizens on board stateless vessels without proof of some connection to the United States, the serious nature of [the drug trafficking] problem, and the fact that persons on board these stateless vessels [generally] are engaged in narcotics trafficking aimed at the United States, warrant an extension in this particular case.").

- 50 -

conviction for this additional reason, notwithstanding that the evidence before us of this practice consists chiefly of what other nations have not done in response to what ours has. See Andrew W. Anderson, Jurisdiction over Stateless Vessels on the High Seas: An Appraisal under Domestic and International Law, 13 J. Mar. L. & Com. 323, 331-32 (1982); Myres S. McDougal, The Law of the High Seas in Time of Peace, 26 Naval War C. Rev. 35, 36 (1973); Myres S. McDougal & William T. Burke, The Public Order of the Oceans: A Contemporary International Law of the Sea 1047 (1962).

But, I am wary of rejecting Aybar's constitutional challenge by relying on either a principle of deference to the political branches that I am not sure obtains or a state practice that is based only on the limited evidence of it that we have here. Rather, I conclude that we -- as a lower court -- must reject it due to the guidance supplied by the more than two-century-old Supreme Court precedent to which the majority gives great weight but ultimately concludes fails to dictate how we must decide this case. See Slip Op. 15-19.

### III.

That precedent, United States v. Holmes, 18 U.S. (5 Wheat.) 412 (1820), was among the cases that the Supreme Court decided just decades after the Constitution's ratification and that are sometimes referred to as the "piracy cases," G. Edward White, The Marshall Court and International Law: The Piracy Cases,

- 51 -

83 Am. J. Int'l L. 727 (1989).  The cases in this line of authority dealt with the United States' power to prosecute defendants of a range of citizenships and circumstances who shared the attribute of having been indicted in our country pursuant to our criminal justice system for murder, robbery, or other wrongdoing on the high seas.  See Holmes, 18 U.S. (5 Wheat.) 412; Furlong, 18 U.S. (5 Wheat.) 184; Smith, 18 U.S. (5 Wheat.) 153; United States v. Klintock, 18 U.S. (5 Wheat.) 144 (1820); United States v. Palmer, 16 U.S. (3 Wheat.) 610 (1818).

These cases were decided amidst the then-swirling debate over whether the law of nations permitted the United States to assert domestic criminal jurisdiction over foreign nationals who committed crimes while on the high seas.  Compare United States v. Robins, 27 F. Cas. 825, 832 (D.S.C. 1799) ("There is no doubt that the circuit courts of the United States have a concurrent jurisdiction" that allows the U.S. government to prosecute the offense of murder aboard a British ship on the high seas, "and this arises under the general law of nations."), with Speech of John Marshall at 598-99 ("It is not true that all nations have jurisdiction over all offenses committed at sea. . . . [T]he jurisdiction of th[is] nation cannot extend to a murder committed by a British sailor, on board a British frigate navigating the high seas under a commission from his Britannic majesty. . . . It follows that no such common jurisdiction exists.").  And Holmes

itself implicated that debate, as it concerned a challenge to the legal basis for a U.S. criminal prosecution of three defendants -- two foreigners and one U.S. citizen -- who had been indicted for knifing and throwing overboard an individual while they were on a vessel on the high seas that did not belong to the United States. See Holmes, 18 U.S. (5 Wheat.) at 412-13; see also The Trial of William Holmes, Thomas Warrington, and Edward Rosewain on an Indictment for Murder on the High Seas Before the Circuit Court of the United States 5 (Boston, Joseph C. Spear 1820) (hereinafter "The Holmes Trial").

Specifically, Holmes posed the following question: when, if ever, is "murder" by a foreign national "committed on the high seas, . . . an offence cognizable by the Courts of the United States"? Holmes, 18 U.S. (5 Wheat.) at 417. The Supreme Court answered as follows.

The Court first observed that, if the murder "be committed on board of a foreign vessel by a citizen of the United States, or on board of a vessel of the United States by a foreigner, the offender is to be considered . . . as belonging to the nation under whose flag he sails." Id. at 417 (emphasis added). But, the Court then continued, there would be jurisdiction in our nation's courts over such a prosecution "if [the vessel] had no national character, but was possessed and held by pirates, or persons not lawfully sailing under the flag of any foreign

- 53 -

nations."  Id. (emphasis added).  And, the Court reiterated this same understanding in the certificate,[10] explaining:  "the said Circuit Court had jurisdiction of the offence charged in the indictment [i.e., murder], if the vessel, on board of which it was committed, had, at the time of the commission thereof, no real national character but was possessed and held by pirates, or by persons not lawfully sailing under the flag, or entitled to the protection of any government whatsoever."  Id. at 419 (emphasis added).

Holmes appears to state, then, that a foreign national is subject to the domestic criminal jurisdiction of the United States if he commits a felony while on a vessel on the high seas that is "not lawfully sailing under the flag of any foreign nation."  Id. at 417 (emphasis added).  For this reason, Holmes appears to sink Aybar's constitutional challenge -- by rejecting the view that a stateless vessel in international waters is a foreign vessel, and by supporting the view that international law does not bar a nation from extending its domestic criminal laws to persons who are engaged in felonious conduct on board vessels

---

[10] The "Certificate" "blend[ed] the views of all the justices together on the broadest common position."  Alfred P. Rubin, The Law of Piracy 141 (1988).

lacking any national character while those vessels are in international waters.[11]

Recognizing the potential threat that Holmes presents, Aybar seeks to keep his challenge afloat in the following way. He argues that Holmes is best read to address only the extent of Congress's power to regulate the conduct of "piracy committed either by a citizen or a foreigner . . . based on the universal jurisdiction of piracy." Accordingly, he contends, Holmes supplies no support for concluding that the law of nations permitted his prosecution under the MDLEA, given that "drug trafficking is not understood to be a universal jurisdiction offense."

The problem for Aybar is that the predicate offense in the foreign nationals' indictment in Holmes was "murder." 18 U.S. (5 Wheat.) at 413. That is significant because it was well understood at the time that general piracy was "rob[bery] . . . on the high seas" and that this single category of piracy offense was, under the law of nations, "punishable by all" -- but "[n]o particular nation can increase or diminish the list of offences thus punishable." Speech of John Marshall at 600; see also Smith,

_____

[11] It is worth noting that the Holmes defendants were apprehended only after they eventually sailed their ship into a harbor in Scituate, Massachusetts; there is no indication that U.S. officials were aboard or interacted with the vessel at the time of the murder. See The Holmes Trial at 6.

18 U.S. (5 Wheat.) at 162 ("[T]he offence [of general piracy] is supposed to depend, not upon the particular provisions of any municipal code, but upon the law of nations, both for its definition and punishment."). Thus, because the charged offense at issue in Holmes was murder on the high seas rather than robbery on the high seas, there is little basis for concluding that the Court understood the foreign national defendants there to have been charged with general piracy -- and thus with a universal jurisdiction offense -- rather than with merely a domestic felony.

That the statute of conviction in Holmes provided that "if any person . . . shall commit, upon the high seas, . . . murder . . . every such offender shall be deemed, taken, and adjudged to be, a pirate and felon, and being thereof convicted, shall suffer death," Act of April 30th, 1790, for the Punishment of Certain Crimes Against the United States, ch. 9 § 8, 1 Stat. 113 (emphasis added), does not suggest otherwise. It was understood at the time that "[a] statute may make any offence piracy, committed within the jurisdiction of the nation passing the statute, and such offence will be punishable by that nation" -- but, unless the statutory offense was general piracy, "[t]he jurisdiction of the nation is [here] confined to its territory and to its own subjects." Speech of John Marshall at 600, 602 (emphases added); see also id. at 600-01 (rejecting the notion that all "piracies at common law" are "punishable by every nation,"

and explaining that a statute might punish murder or other crimes as piracy, but such a "municipal regulation could not be considered as proving that those offences were . . . piracy by the law of nations"); Eugene Kontorovich, The "Define and Punish" Clause and the Limits of Universal Jurisdiction, 103 Nw. U. L. Rev. 149, 167 (2009) (explaining the then-familiar understanding that general piracy and municipal piracy were not equivalent).

Nor is there anything in Holmes that indicates that the Court understood the offense of murder that was at issue -- denominated though it was in the underlying federal criminal statute as a species of piracy -- to constitute "general" rather than "municipal" piracy. In fact, during the sentencing proceedings in Holmes, Justice Story, who not only participated in the case at the Supreme Court but also, while riding circuit, below in the First Circuit, referenced the defendants' mutiny aboard the vessel in question -- noting that the knifing had been part of a plan to seize control of the ship -- and informed the offenders that their conduct could have been indicted as a form of general piracy. See The Holmes Trial at 16-17. But, Justice Story made clear, the offense of murder on the high seas, for which the defendants had been indicted, was not itself such an offense. Indeed, he contrasted that offense with robbery on the high seas, which he concluded the defendants could have been indicted for in consequence of their "piratical usurpation and seizure of the

vessel," and which would have "left [them] only the character of general pirates and enemies of the human race, who had thrown off allegiance to all nations, and were justly amenable for [their] crime to the tribunal of all."  The Holmes Trial at 16-17; see also Report on the Trial of Samuel Tulley and John Dalton, on an Indictment for Piracy and Murder, Committed January 21st, 1812, Before the Circuit Court of the United States 30-31, 33 (Boston, J. Belcher 1812) (reporting a decision by Judge Davis, in which Justice Story concurred, which noted that "[t]he description of the offense [of piracy] in the first part of the 8th Section of [the Act of 1790] is analogous to the common law description" of piracy, as distinct from "piracy by the law of nations").

I do recognize that Holmes refers at one point to the vessel that the defendants were on as being "piratical."  18 U.S. (5 Wheat.) at 417.  But, this reference also does not help Aybar in his attempt to show that Holmes fails to undermine the basis for his constitutional challenge to his conviction.

In describing the vessel from which the defendants committed the charged offense as "piratical," Holmes was not purporting to describe the nature of the defendants' charged offense as one that constituted general piracy.  As we have seen, it was understood by those involved -- Justice Story among them -- that the offense did not qualify as such.  Holmes was simply explaining why the vessel that the defendants had been on in the

- 58 -

high seas was fairly deemed to have no national character, or, otherwise put, to be stateless as opposed to foreign, such that the United States could subject those aboard to our laws. For, a description of the evidence presented during the proceedings below reveals that the vessel on which the defendants had been when committing the murder on the high seas had earlier been unlawfully captured in those waters by pirate ships, at least if one followed the Court in disbelieving testimony that the seizing ships "were publicly fitted out at Buenos Ayres" and intended to "molest[] none but Spanish vessels." The Holmes Trial at 5, 7-8, 12; see Eugene Kontorovich, Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction over Drug Crimes, 93 Minn. L. Rev. 1191, 1228 (2009) (arguing that the vessel in Holmes was "stateless by virtue of 'turning pirate'"); see also Talbot v. Jansen, 3 U.S. (3 Dall.) 133, 159 (1795) (opinion of Iredell, J.) ("[If] upon the enquiry it shall appear, that the vessel pretending to be a lawful privateer, is really not such, but uses a colourable commission for the purposes of plunder, she is to be considered by the law of nations . . . in the same light as having no commission at all."); The Holmes Trial at 10-11 ("If a murder be committed on board of a ship having no national character, as on board of ships owned and possessed by pirates, it is within the statute, if the ship be on the high seas when the crime is perpetrated. . . . Palmer's case goes only to exclude the operation of the statute,

in cases where other nations have an exclusive jurisdiction.");
cf. Palmer, 16 U.S. (3 Wheat.) at 632-33 ("The[r]e are offences
against [a] nation under whose flag the vessel sails, and within
whose particular jurisdiction all on board the vessel are. Every
nation provides for such offences the punishment its own policy
may dictate; and no general words of a statute ought to be
construed to embrace them when committed by foreigners against a
foreign government." (emphasis added)).[12]

Moreover, Aybar, who has waived any challenge to whether
his vessel was actually stateless, makes no argument to us that
the statelessness of a vessel in international waters permits the
foreign national aboard it to be subjected to our domestic criminal

_____

[12] See Letter from John Quincy Adams, U.S. Sec'y of State, to Francisco Dionisio Vives, Ambassador of Spain to the U.S. (May 3, 1820), reprinted in 5 Wheat. App. 154 (1820) (explaining that "[i]n the existing unfortunate civil war between Spain and the South American Provinces, the United States have constantly avowed, and faithfully maintained, an impartial neutrality," although the United States would -- and did -- prosecute "individuals guilty of piracy" that "illegally captured" "Spanish property" (emphasis added)); The Holmes Trial at 11 (reporting Justice Story's charge to the jury that "[i]f at the time when the crime was committed, . . . this vessel was under the exclusive jurisdiction of the Government of Buenos Ayres, then the statute does not reach the case [of murder aboard a foreign-flagged ship], and the Prisoners ought to be acquitted. And this depends on the fact, whether the capture was made by the privateers, under any authority derived from the Government of Buenos Ayres as a belligerent and independent nation . . . [and] sailed rightfully under its flag . . . [as this would mean] the capture was rightful, and the captured vessel immediately after the capture, may be justly deemed to have been exclusively under the jurisdiction of the Government of Buenos Ayres.").

laws consistent with the law of nations only if the vessel is stateless by virtue of it having engaged in conduct that qualifies as general piracy.  Aybar instead argues to us only that there is an important distinction to be drawn under the law of nations between offenses that are of universal jurisdiction and offenses that are not, and that the offense for which he was charged -- drug trafficking -- is of the latter kind.

Thus, the fact that Holmes deemed the foreign nationals who were the defendants in that case to be on a vessel lacking national character because it was piratical lends little aid to Aybar's cause.  The offense that was at issue in Holmes was a mere domestic felony, just like his, and it occurred on a vessel that was stateless, just like his.[13]

---

[13] Interestingly, in his charge to the jury, Justice Story explained that the defendants could even be prosecuted if they had committed the murder while aboard no ship:

> The statute refers as to locality to "the high seas" only, and it would be far too narrow a construction, to limit its operation to crimes committed on board of ships or vessels. Murder may be committed on the high seas when neither the murderer, or the murdered is on board of any ship or vessel. A man may in the sea murder another who is in the sea swimming, or on a plank or raft; and it is obvious, that when the death is by drowning, the murder is committed literally on the high seas, wherever the murderer may at the time be. . . . We see no reason in a case of this sort, where the murder is committed actually in the sea, why the case which is within the literal terms of the statute, should not be held within its purview, whether the murder were committed by

Aybar also makes no argument to us that even if Holmes did take an expansive view of the United States' authority to assert domestic criminal jurisdiction over foreign nationals engaged in felonious conduct on a stateless vessel on the high seas, intervening developments in international law preclude us from construing Article I's Define and Punish Clause to permit Congress to rely on that power to enact this criminal statute on the understanding of the law of nations that Holmes embraced.  His

> a citizen on a citizen, or by a foreigner on a citizen, or by a foreigner on a foreigner. Such a case is not within the reason of Palmer's case.  Every nation has concurrent jurisdiction with every other nation on the high seas; and when a crime is committed on the high seas, not on board of any ship or vessel, it is not exclusively within the jurisdiction of any nation; and every nation may, if it choose, punish such crime without doing any wrong to either nation.

The Holmes Trial at 10 (emphasis added).  In Homes itself, moreover, the Supreme Court agreed that

> it makes no difference whether the offence was committed on board of a vessel, or in the sea, as by throwing the deceased overboard and drowning him, or by shooting him when in the sea, though he was not thrown overboard.  The words of the above act of Congress are general, and speak of certain offences committed upon the high seas, without reference to any vessel whatsoever on which they should be committed; and no reason is perceived why a more restricted meaning should be given to the expressions of the law, than they literally import.

18 U.S. (5 Wheat.) at 418 (emphasis added).

- 62 -

only contention regarding <u>Holmes</u> is that it did not embrace that understanding of the law of nations even then.

**IV.**

For these reasons, I am convinced that <u>Holmes</u> requires that we conclude that the Define and Punish Clause is best understood not to contain an implicit limit that would prevent the United States from prosecuting foreign nationals for their felonious conduct on stateless vessels in international waters. The founding generation was attentive to the strictures of the law of nations. <u>See</u> David M. Golove & Daniel J. Hulsebosch, <u>The Law of Nations and the Constitution: An Early Modern Perspective</u>, 106 Geo. L. J. 1593, 1595-96 (2018) (describing "the prominent place of the law of nations in the constitutional reform project that culminated in the Philadelphia Convention"). And so, as between the uncertain or even skeptical views of more contemporary commentators on the law of nations and the seemingly unqualified statements of the Supreme Court in <u>Holmes</u>, I am persuaded that the latter must control our judgment as a lower court in this case -- at least given that state practice is not clearly contrary to what the political branches of our country assert it to be. <u>See</u> <u>United Nurses & Allied Prof'ls</u> v. <u>Nat'l Labor Rels. Bd.</u>, 975 F.3d 34, 40 (1st Cir. 2020) ("We are bound by the Supreme Court's 'considered dicta.'" (quoting <u>McCoy</u> v. <u>Mass. Inst. of Tech.</u>, 950 F.2d 13, 19 (1st Cir. 1991))).

Accordingly, I would affirm Aybar's conviction against his constitutional challenge to Congress's exercise of its Article I power on the basis of Holmes, while leaving all other questions -- including whether and when MDLEA prosecutions comport with the Fifth Amendment's Due Process Clause -- for a case in which they are properly raised. I do note, though, that while I reach the same destination as the majority, the route that I take to get there may bear on the proper answer to at least one question that the case before us does not require us to resolve.

I do not dispute the majority's observation that "fair warning has certainly been given" that drug trafficking is commonly outlawed. Slip Op. 32. But, there is potentially a separate notice question concerning whether "fair warning" exists as to where that commonly outlawed offense may be prosecuted. Cf. Int'l Shoe v. Washington, 326 U.S. 310, 316 (1945) ("[D]ue process requires . . . that, in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it . . . .").

It is not clear to me that our own Supreme Court's precedent (let alone precedents from lower U.S. courts such as ours) as to the scope of valid congressional power over misconduct by foreign nationals on stateless vessels on the high seas could supply fair warning on the "where" question to a foreign national. At least, I am not sure that it could do so if other authoritative

sources for determining the content of the law of nations -- ones not generated solely by a single country's legal system -- do not themselves provide fair warning that all nations possess territorial jurisdiction over the conduct of foreign nationals on board stateless vessels in international waters and thereby makes them potentially subject to prosecution in any nation under its domestic criminal laws.

Aybar, however, does not pursue a due process challenge to his conviction. I thus see no need to decide here whether the law of nations, uncertain though it appears to me to be in that respect, is nonetheless clear enough to provide a person who ventures into international waters in a stateless vessel the constitutionally requisite degree of warning of the risk of being prosecuted in a foreign forum for drug trafficking while on board that vessel. Nor do I see any reason to decide in this case whether Holmes itself requires us to conclude that, despite what more modern commentary suggests, the law of nations is clear enough on that score to mitigate any notice concerns that might be of a constitutional magnitude.